858 So.2d 1147 (2003)
Sandra G. RUBERG, Appellant/Cross-Appellee,
v.
David C. RUBERG, Appellee/Cross-Appellant.
Nos. 2D01-2139, 2D01-4224, 2D02-1067.
District Court of Appeal of Florida, Second District.
November 7, 2003.
*1149 Arnold D. Levine and Robert H. Mackenzie of Levine, Hirsch, Segall, Mackenzie & Friedsam, P.A., Tampa, for Appellant/Cross-Appellee.
David A. Maney and Patricia F. Kuhlman of Maney, Damsker, Jones, Kiely & Kuhlman, P.A. Tampa, for Appellee/Cross-Appellant.
CANADY, Judge.
In these consolidated appeals, the appellant/cross-appellee, Sandra G. Ruberg, challenges the following: the equitable distribution scheme set forth in a final judgment *1150 of marital dissolution; an order that only partially grants her motion for attorney's fees and costs with respect to the marital dissolution; and an order that denies her request for an increased alimony award. On cross-appeal, the appellee/cross-appellant, David C. Ruberg, challenges a provision of the final judgment of marital dissolution that requires him to maintain a $1,000,000 life insurance policy for the benefit of Mrs. Ruberg and an order that denies his request for a decrease in Mrs. Ruberg's alimony award. We affirm in part and reverse in part.

I. BACKGROUND
The parties were married in 1976. They have three adult children. During the marriage, the parties relocated several times to different parts of the country due to Mr. Ruberg's employment. The Ruberg family moved to Tampa in 1993, when Mr. Ruberg was hired as president and chief executive officer of Intermedia Communications, Inc.
On September 17, 1998, Mrs. Ruberg filed for divorce. A final judgment dissolving the parties' marriage was entered on October 18, 2000. The equitable distribution of the parties' marital assets did not occur, however, until April 5, 2001, when a second final judgment of marital dissolution was entered. That judgment reaffirmed and incorporated by reference the October 2000 dissolution judgment, awarded Mrs. Ruberg permanent monthly alimony, and divided and distributed the parties' marital assets.
A. Equitable Distribution
The April 2001 judgment awarded Mrs. Ruberg marital assets with a net value of $1,126,971. Those assets included, among other things, the marital home; a second residence the parties purchased for Mrs. Ruberg's elderly father; retirement, investment, and bank accounts that had been jointly owned by the parties; and $360,000, which Mr. Ruberg paid to Mrs. Ruberg during the pendency of the dissolution proceedings.
The April 2001 final judgment also provided for an equal division of 675,301 shares of Intermedia stock. That stock had been awarded to Mr. Ruberg in a series of option and restricted share grants during his employment with Intermedia. The trial court determined that one of those grants was awarded as a signing bonus when Mr. Ruberg began his employment with Intermedia and that the others constituted long-term incentive compensation to Mr. Ruberg. It was established that the block of 675,301 shares had vested and become exercisable prior to the filing date of Mrs. Ruberg's dissolution petition. The trial court determined those shares to be marital property subject to equitable distribution. The trial court, however, found that another 299,370 shares of stock options and 170,482 shares of restricted stock were unvested and constituted nonmarital property.
B. Alimony
The trial court went on to award Mrs. Ruberg $18,000 in permanent monthly alimony. The final judgment contains an extensive discussion of the testimony adduced by the parties concerning the economic factors to be considered under section 61.08(2), Florida Statutes (2001), in determining alimony. In its discussion, the trial court makes reference to evidence adduced by Mrs. Ruberg pointing to a monthly needbased on the parties' lifestyle during the marriagein excess of $45,000 (pretax). The trial court did not, however, make any specific findings regarding the amount of alimony needed by Mrs. Ruberg to maintain the standard of living she enjoyed during the marriage.
*1151 As security for the payment of the alimony, Mr. Ruberg was ordered to "maintain a $1,000,000 [term] life insurance policy (death benefits), of which Mrs. Ruberg [was] to be a beneficiary so long as [Mr. Ruberg was] obligated to pay Mrs. Ruberg permanent alimony." The judgment contains no findings related to the life insurance requirement.
The trial court reserved jurisdiction to revisit and reevaluate the alimony issue, if necessary. The trial court did so because, when the alimony award was entered, a merger between Intermedia and World-Com, Inc., was pending. The merger agreement specified that WorldCom's purchase price for Intermedia would be based on a stock price of thirty-nine dollars per share. Due to the volatility of the stock market at the time of the equitable distribution of the parties' marital assets and the uncertainty of whether the sale of Intermedia to WorldCom would actually closeor what the share price would be if it did closethe trial court indicated that "the [p]arties may or may not receive substantial value in the assets distributed to them." The trial court thus reserved jurisdiction "to adjust the amount of the permanent alimony award once the sale of Intermedia to WorldCom [was] concluded and th[e][c]ourt [was] able to determine the value of those assets received by Mrs. Ruberg as equitable distribution of marital assets." The trial court also reserved jurisdiction to determine Mrs. Ruberg's claim for attorney and expert witness fees and costs. On May 9, 2001, after the denial of the parties' respective motions for rehearing, Mrs. Ruberg timely appealed the final dissolution judgment, and Mr. Ruberg cross-appealed.
C. Attorney's Fees
On August 2, 2001, the trial court ruled on Mrs. Ruberg's fee motion. After considering each of the parties' financial resources and determining that Mr. Ruberg's future "earning ability [was] substantially superior to that of [Mrs. Ruberg]," the trial court entered an order directing Mr. Ruberg to pay a total of $241,949.15 toward Mrs. Ruberg's fees and costs. That sum was in addition to significant sums Mr. Ruberg had previously contributed to Mrs. Ruberg's attorney's fees during the pendency of the dissolution proceedings. The fee order provided that Mrs. Ruberg "shall be responsible for any other outstanding balances of fees and costs," and that her "request for reimbursement of any other fees and/or costs paid by her is denied." On August 28, 2001, Mrs. Ruberg timely appealed the trial court's fee order to this court.
D. Alimony Modification
Thereafter, the merger of Intermedia and WorldCom successfully closed. Thus, on November 12, 2001, this court relinquished jurisdiction as to the appeal from the final dissolution judgment to allow the trial court to consider the parties' respective motions for modification of the original alimony award in accord with the reservation of jurisdiction set forth in the final dissolution judgment.
On March 11, 2002, the trial court entered its order denying Mrs. Ruberg's motion to increase and Mr. Ruberg's motion to decrease the alimony award. Upon determining that the then-current net value of Mrs. Ruberg's WorldCom stock was $2,417,246based on a share price of fifteen dollarsthe trial court refused to increase her monthly alimony award. The trial court likewise refused to decrease Mrs. Ruberg's alimony, despite Mr. Ruberg's argument that the proceeds of Mrs. Ruberg's WorldCom stock would warrant the imputation of significant income to her. *1152 The trial court ultimately found that Mr. Ruberg failed to produce "evidence of a prudent investment portfolio for [Mrs. Ruberg]." The trial court nonetheless determined that Mrs. Ruberg was entitled to attorney's fees and costs in the postjudgment proceedings, based on the disparity of the parties' respective incomes and assets. Mr. Ruberg was ordered to pay a total of $45,060.92 for the fees and costs incurred by Mrs. Ruberg in litigating the reconsideration of her alimony award. Mrs. Ruberg timely appealed the order denying her request for modification of the alimony award, and Mr. Ruberg cross-appealed.

II. ANALYSIS
The parties raise certain issues which are without merit and do not warrant discussion. We limit our comments to the following issues.

A. Equitable Distribution of Stock Options and Restricted Shares

Mrs. Ruberg contends the trial court erred in failing to find that Mr. Ruberg's unvested Intermedia stock options and restricted shares constituted marital property subject to equitable distribution. She argues that those unvested shares were marital assets, because they were rewards for Mr. Ruberg's past job performance that is, his job performance during the course of the parties' marriageand thus constituted deferred compensation. We disagree with Mrs. Ruberg's argument, because we conclude that the stock options and restricted shares at issue were granted in consideration of Mr. Ruberg's future job performance and not based on his past efforts.
Section 61.075(5)(a)4 defines "[m]arital assets" to include "[a]ll vested and nonvested benefits, rights, and funds accrued during the marriage in ... deferred compensation ... plans and programs." As the term implies, deferred compensation consists of funds already earned but for which payment is deferred. For equitable distribution purposes, a deferred compensation account is considered marital property to the extent it consists of contributions from funds earned during the marriage. Boyett v. Boyett, 703 So.2d 451, 452 (Fla.1997); Thibault v. Thibault, 668 So.2d 237, 238 (Fla. 1st DCA 1996). Stock options and restricted shares may be given as deferred compensation for past services, but they may also be given as compensation for present or future services. See Seither v. Seither, 779 So.2d 331, 333 (Fla. 2d DCA 1999) (stating that when a stock "option is given as compensation, it can be deferred compensation for past services, compensation for present services, or compensation for future services"). Under section 61.075(6), the "cut[]off date for determining assets ... to be identified or classified as marital assets [may be established as] the date of the filing of a petition for dissolution of marriage," as was the case here.
In the April 2001 final dissolution judgment, the trial court specifically found that the unvested stock options and restricted shares constituted incentives that looked to future labor and "continued superior performance" by Mr. Rubergnot past performance. The trial court's finding in that regard was based primarily on the provisions of the Intermedia 1992 stock option plan document, the 1996 long-term incentive plan document, and the individual "incentive" stock option and restricted share agreements executed by Mr. Ruberg and Intermedia.
Intermedia's 1992 plan document provided that Intermedia's board of directors or a compensation committee composed of at least three board members was authorized to offer stock options for the purpose of "attract[ing] and retain[ing] the best personnel *1153 available ... and to provide additional incentive to such employees to exert their maximum efforts toward the success of the [c]ompany and its subsidiary corporations." When Mr. Ruberg was hired by Intermedia, he was awardedpursuant to the 1992 planan initial stock option grant that was intended as a signing bonus for coming on board with the company and to augment his starting salary, which was lower than the industry standard. That grantwhich is not at issue in this appealwas specifically set forth in Mr. Ruberg's employment contract.
All subsequent option and restricted share grants to Mr. Ruberg were awarded in separate agreements executed pursuant to either Intermedia's 1992 stock option plan or Intermedia's 1996 long-term incentive plan. The stated purpose of the 1996 plan, like that of the 1992 plan, was "to attract and retain and provide incentives to employees, officers, directors[,] and consultants of [Intermedia], and to thereby increase overall shareholder value." Each of the individual stock option agreements executed between Intermedia and Mr. Ruberg recited that the option grant was intended "as an incentive for [Mr. Ruberg] to advance the interests of the company." In each case, the agreement provided that the options would vest in specified monthly increments and that "vesting [would] cease to continue upon any termination of [e]mployment."
The decision in Jensen v. Jensen, 824 So.2d 315 (Fla. 1st DCA 2002), deals at length with the issue of whether stock options granted during a marriage but yet unvested on the filing date of a dissolution petition constitute marital property. In Jensen, the husband, during the marriage, was "granted several thousand stock options" by his employer, Cisco Systems. Id. at 316-17. The contract pursuant to which those options were granted indicated that they were awarded "in recognition of past commendable service [but were] contingent upon [the husband's] continued service with either Cisco Systems or any of its subsidiaries." Id. at 317. The trial court determined that the unvested options constituted marital property and were to be equally divided between the husband and wife. The First District affirmed, concluding that the unvested stock options were a form of deferred compensation under section 61.075(5)(a)4. The court based that conclusion on its determination that the options were awarded for the husband's past performance, despite the fact that he had to remain with the company if he wished to exercise them. The First District thus held that, notwithstanding that the husband's options were contingent on continued service, it was the date on which the options were granted and not the vesting date that was dispositive as to the character of the options as marital or nonmarital property.
Although the factual circumstances in Jensen appear to be similar to those involved in the instant case, there is a critical dissimilarity. The Jensen court focused on a circumstance that is not present in the instant casenamely, the fact that the options granted to Jensen "represent [Jensen's] past commendable employment service to Cisco Systems that he provided during the marriage." Id. at 318-19. We agree that options can be a form of deferred compensation. We also agree that options granted prior to the cutoff date for the determination of marital assets maydepending on the circumstancesbe marital property even if they remain unvested as of the cutoff date. But not all options granted prior to the cutoff date for the determination of marital assets are deferred compensation. The critical factor in determining the nature of options that have not vested by the cutoff *1154 date is the predominant purpose for which the options were given. The dispositive issue is whether the grant was made in consideration for actions undertaken during the marriage and before the applicable cutoff date.
We agree with various cases from other jurisdictions which hold that the status of such unvested options turns on the factual issue of whether the unvested stock options and restricted shares were primarily awarded as deferred compensation for past service or as an incentive for future services. See, e.g., Wendt v. Wendt, 59 Conn.App. 656, 757 A.2d 1225, 1235 (2000) (stating that determination of purpose for which stock options were awarded is question of fact); In re Marriage of Miller, 915 P.2d 1314, 1318 (Colo. 1996) (stating that, in determining character of stock options for purposes of equitable distribution, courts must consider whether options were awarded for past, present, or future services); In re Marriage of Short, 125 Wash.2d 865, 890 P.2d 12, 16 (1995) (stating that, in characterizing as marital or nonmarital unvested stock options granted during marriage, courts must look to circumstances under which options were granted and determine whether they were rewards "to compensate the employee for past, present, or future employment services"); In re Marriage of Hug, 154 Cal.App.3d 780, 201 Cal. Rptr. 676, 685 (1984) (approving the use of a time rule to apportion stock options awarded during the marriage but unvested at the time of the divorce petition but stating "we stress that no single rule or formula is applicable to every dissolution case involving stock options"). Stock option or restrictive share grants constitute compensation for future servicesand not deferred compensationwhen they are awarded as an incentive to an employee to render continued and future services to a company and as incentive for future productivity. Miller, 915 P.2d at 1319-20; Short, 890 P.2d at 18; Hug, 201 Cal.Rptr. at 680; see also Thomas P. Malone, Employee Stock Options & Restricted Shares: Determining & Dividing the Marital Pot, 25 Colo. Law. 87, 91 (Oct.1996).
We acknowledge that there is an element of compensation for future services in all option grants that are subject to vesting contingent on continued employment. The requirement of continued employment indicates that future services are to some extent in view when the grant is made. But that does not mean that all options that are subject to such future vesting are awarded for future services and are thus not deferred compensation. See Jensen, 824 So.2d at 316-17 (concluding that stock options granted in recognition of past performance but contingent on continued service constituted deferred compensation). The issue is whether at the time the grant is made the primary purpose of the grant is to provide compensation for past services or for future services. If the primary purpose is to compensate for past services, the award is a form of deferred compensation. If the primary purpose is to compensate for future services, the award is not a form of deferred compensation. The primary purpose of an option grant is, of course, a factual question that depends on the pertinent circumstances. And the expressed purpose of the employer is an important factor in determining that factual question.[1]
*1155 In the instant case, the record shows that the plan documents clearly provided for option and restricted share grants to employees for future services. Likewise, the individual agreements which made the grants clearly indicate that the grants were intended as incentives for Mr. Ruberg to remain employed with the company, to render future services, and to otherwise advance the future interests of the company. Further, the monthly incremental vesting schedules for the stock options and restricted shares suggest that each monthly increment of stock options and restricted shares vested as it was earned. All the pertinent circumstances support the conclusion that the trial court correctly determined that the stock options and restricted shares that remained unvested as of the filing date of the dissolution petition constituted separate, nonmarital property that were mere expectancies for Mr. Ruberg until he earned them. See Miller, 915 P.2d at 1318. In short, the stock options and restricted shares at issue were not deferred compensation, and the trial court did not err in classifying them as nonmarital property.[2]
B. The Alimony Award
1. Monthly Alimony
Mrs. Ruberg also contends that her $18,000 monthly alimony award is inadequate. She claims she established her monthly need as $35,000after taxes. While the final judgment discusses some of the alimony evidence presented by the partiesand the quality thereof-it does not make express factual findings as to Mrs. Ruberg's need to support the $18,000 award. The trial court thus failed to comply with the requirement of section 61.08(1), that "[i]n all dissolution actions[] the court shall include findings of fact relative to [the statutory factors] supporting an award or denial of alimony." A trial court's failure to make specific factual findings with regard to alimony "may preclude meaningful appellate review[] and result in a case having to be reversed and remanded." Walsh v. Walsh, 600 So.2d 1222, 1223 (Fla. 1st DCA 1992) (citation omitted). Because the trial court made no specific factual findings to support the $18,000 alimony award and we have an inadequate basis for determining if the award was proper, we conclude that the award of monthly alimony must be reversed and the matter remanded for further proceedings. On remand, the trial court may consider the parties' then-current circumstances in determining the amount of alimony. See McLean v. McLean, 652 So.2d 1178, 1182 (Fla. 2d DCA 1995) (stating that on remand "[t]he trial court is free to consider the parties' present economic circumstances").
2. Life Insurance Requirement
On his cross-appeal from the final dissolution judgment, Mr. Ruberg contends the *1156 trial court erred in requiring him to maintain a $1,000,000 life insurance policy for the benefit of the wife as a way of insuring her alimony needs. Without explanation, the final judgment states that the husband is required to maintain the policy "so long as he is obligated to pay Mrs. Ruberg permanent alimony." Mr. Ruberg argues there is no basis for the life insurance requirement and that the payment of $1,000,000 at his death in essence requires him to continue paying alimony from the grave.
Section 61.08(3) provides:
To the extent necessary to protect an award of alimony, the court may order any party who is ordered to pay alimony to purchase or maintain a life insurance policy or a bond, or to otherwise secure such alimony award with other assets which may be suitable for that purpose.
We conclude that the requirements of the statute have not been met because the instant record contains nothing to establish that the $1,000,000 life insurance policy was "necessary to protect [the] award of alimony."
In Sobelman v. Sobelman, 541 So.2d 1153, 1154-55 (Fla.1989), the supreme court held "that section 61.08(3) permits the trial court to order an obligated spouse, as an integral part of the equitable distribution and support schemes, to purchase life insurance or other security either to satisfy [arrears] or to otherwise protect the receiving spouse in appropriate circumstances." The Sobelman court did not delineate the particular circumstances in which the imposition of such an insurance requirement would be "appropriate." The court did, however, refer to "protect[ing] the financial well[-]being of the other spouse." Id. at 1154. And the Sobelman court favorably cited the decisions in Clark v. Clark, 509 So.2d 364 (Fla. 4th DCA 1987), and Fiveash v. Fiveash, 523 So.2d 764 (Fla. 1st DCA 1988), describing them as cases where "the wives were in ill health and for all practical purposes unable to obtain employment," and the trial courts "were concerned with the possibility of the husbands['] predeceasing the wives, leaving them without financial resources." Id. at 1154 n. 1.
In Sasnett v. Sasnett, 679 So.2d 1265, 1268 (Fla. 2d DCA 1996), we focused on circumstances similar to those present in Clark and Fiveash and held that the facts of the case "clearly demonstrate[d] the `appropriate circumstances' to require some form of security [for] the alimony award." The relevant circumstance was identified as the ill health of the receiving spouse. In justifying the imposition of a security requirement, the court observed that "[t]he husband's sudden demise would seriously jeopardize the wife's well[-]being, both financially and healthwise." Id.
The Fifth District reached a similar conclusion in Richardson v. Richardson, 722 So.2d 280, 281 (Fla. 5th DCA 1998), where the wife was "not in good health and ha[d] been advised not to get a job." The Richardson court indicated that the wife's desperate financial circumstances in the event of the husband's death would "jeopardize the wife's very existence." Id. at 282.
We have held that a life insurance or other security requirement is only appropriate where "special circumstances" are shown to exist. See Pinion v. Pinion, 818 So.2d 557, 557 (Fla. 2d DCA 2002) ("In the absence of special circumstances, a spouse cannot be required to maintain life insurance for the purposes of securing alimony obligations.") (citations omitted); Solomon v. Solomon, 28 Fla. L. Weekly D1960, D1961, 2003 WL 21990208 (Fla. 2d DCA 2003); Cozier v. Cozier, 819 So.2d 834, 837 (Fla. 2d DCA 2002). The statute does not contemplate that a requirement for life insurance or other security will be *1157 standard and customary in dissolution proceedings whenever periodic alimony is awarded. The presence of special circumstances is thus required to establish that the provision of life insurance or other security is "necessary to protect [the] award of alimony" under section 61.08(3). See also Lapham v. Lapham, 778 So.2d 487, 489 (Fla. 5th DCA 2001) (stating that life insurance requirement or other security "is not required or automatic ... [but] `it is [instead] justified only if there is a demonstrated need to protect the alimony recipient'") (citation omitted). Such special circumstances are present when the receiving spouse is faced with being plunged into "dire economic straits upon the untimely death of [the paying spouse]." Baker v. Baker, 763 So.2d 493, 495 (Fla. 4th DCA 2000) (citing Richardson, 722 So.2d at 281, and Sasnett, 679 So.2d at 1268-69); see also Forgione v. Forgione, 845 So.2d 968, 970 (Fla. 4th DCA 2003) (holding that where wife "was of limited employability," had few assets, and "husband was scheduled for open[-]heart surgery... the wife demonstrated a special circumstance to require the husband to maintain life insurance on her behalf").
In the present case, as the trial court specifically found, there is no evidence of arrearage. There is also no record evidence to establish that Mrs. Ruberg is disabled or suffers from any serious health problems. In fact, the trial court expressly found both parties to be in good health. There is no evidence that Mrs. Ruberg is unemployable or that her financial assets will be insufficient to sustain her in the event of Mr. Ruberg's untimely death. There is thus no basis in the record for concluding that Mrs. Ruberg would face dire economic circumstances if Mr. Ruberg died. And there is nothing in the record to show that Mrs. Ruberg demonstrated any other special circumstances that would justify the trial court's imposition of the life insurance requirement. Thus, because there is no basis in the record to support the requirement that Mr. Ruberg maintain a $1,000,000 life insurance policy to secure the alimony award, we reverse on this point and strike the life insurance provision from the final dissolution judgment. See Solomon, 28 Fla. L. Weekly at D1961; Lapham, 778 So.2d at 489.
C. Attorney's Fees
Mrs. Ruberg challenges an order that partially denies her request for attorney's fees and costs expended as a result of the trial court proceedings. The record shows that Mr. Ruberg has contributed enormously to Mrs. Ruberg's litigation fees and costs. The record also shows that Mrs. Ruberg has sufficient assets to pay her attorney's fees-as this court previously found in an order issued on June 11, 2002, reversing a trial court order granting Mrs. Ruberg temporary appellate attorney's fees. See also Stoler v. Stoler, 679 So.2d 837, 838 (Fla. 2d DCA 1996) (reversing order requiring husband to pay all of wife's attorney's fees where record showed that wife had sufficient assets to pay a portion of her own fees and costs). We conclude that the trial court correctly determined that Mrs. Ruberg failed to establish sufficient need for additional attorney's fees. We therefore affirm the trial court's order on fees.
D. Modification of Alimony
Mrs. Ruberg contends the trial court erred in failing to increase her alimony award. On cross-appeal, Mr. Ruberg contends the trial court erred in failing to decrease the alimony award. Because we have determined that remand is necessary to revisit Mrs. Ruberg's alimony award, we need not address this issue. Our affirmance of the trial court's denial of the motions for modification submitted by both Mrs. Ruberg and Mr. Ruberg is without *1158 prejudice to the further consideration on remand of the issues they each raised with respect to modification.

III. CONCLUSION
Accordingly, the final judgment of marital dissolution is reversed only with respect to Mrs. Ruberg's monthly alimony award and the provision that requires Mr. Ruberg to maintain a $1,000,000 life insurance policy to secure the alimony award. The issue of monthly alimony is therefore remanded for further proceedings. The final dissolution judgment is affirmed in all other respects, as are the order partially denying Mrs. Ruberg's request for attorney's fees and costs and the order denying the parties' respective motions to modify the alimony award.
Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.
FULMER and CASANUEVA, JJ., Concur.
NOTES
[1] In this case we are not called on to address the circumstance in which the pertinent facts do not establish either that the grant was primarily for past service or primarily for future service. See, e.g., Wendt, 757 A.2d at 1235-36 (involving situation where certain unvested stock options were awarded for past, present, and future services and thus required the application of a "coverture factor" to allocate marital portions of those options).
[2] We note that the division and classification of the particular options and restricted shares as marital and nonmarital was simplified in this case by the fact that the options and restricted shares vested monthly as they were earned. It has therefore not been necessary for us to address the appropriate methodology for allocating options that were earned before the applicable cutoff date but remained unvested. See, e.g., In re Marriage of Short, 890 P.2d at 17 (applying a "time rule" for determining each spouse's respective interest in stock options that vest after the parties are "`living separate and apart'" but which are in part attributable to efforts expended both during and after the marriage); In re Marriage of Hug, 201 Cal.Rptr. at 685 (applying a time rule to certain stock options as they were paid after the marriage to allocate the portions of those options which were attributable to efforts expended during the marriage).